IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

LEATHERMAN TOOL GROUP, INC.,
an Oregon Corporation,

                Plaintiff,

   v.

COAST CUTLERY CO., an Oregon
Corporation,

                Defendant.

No. 03:11-CV-615-HZ

OPINION & ORDER

John F. McGrory , Jr.
Kaley L. Fendall
Davis Wright Tremaine LLP
1300 SW Fifth Avenue, Suite 2300
Portland, OR 97201-5630

Benjamin J. Byer
Stuart R. Dunwoody

1 - OPINION & ORDER

Davis Wright Tremaine LLP
1201 Third Avenue, Suite 2200
Seattle, WA 98101

    Attorneys for Plaintiff

Peter E. Heuser
Matthew R. Wilmot
Schwabe Williamson & Wyatt
1211 SW 5th Avenue, Suite 1900
Portland, OR 97203

    Attorneys for Defendant

HERNANDEZ, District Judge:

    Plaintiff Leatherman Tool Group moves for a preliminary injunction against Defendant Coast Cutlery. Leatherman seeks an injunction to (1) forbid Coast from falsely stating its knives are made from 440C steel; (2) forbid Coast from falsely stating its knives are hardened to between 57 and 59 HRC; (3) enjoin Coast from falsely stating that each of its knives is individually hardness tested; and (4) order Coast to send corrective notices to retailers and customers disclosing that its knives are not made of 440C steel, not hardened to between 57 and 59 HRC, and not individually hardness tested.[1]  Pl.'s Memo. in Supp. of Mot. for Prelim. Inj. ("Leatherman Memo"), 2-3. Because Leatherman has failed to show a likelihood of irreparable harm, I deny the motion for a preliminary injunction.

BACKGROUND

    Plaintiff Leatherman is a manufacturer of multi-tools and knives designed for outdoor, tactical, professional, and general use. Compl. ¶4. Defendant Coast also manufactures multi-

---

[1] Leatherman had initially requested that Coast be enjoined from characterizing the steel used to make its knives as "high quality" or "cutlery grade" stainless steel. However in its reply, Leatherman withdrew this request.

2 - OPINION & ORDER

tools and knives. Id. at ¶5. Leatherman has brought a false advertising claim under 15 U.S.C. § 1125(a), more commonly known as § 43(a) of the Lanham Act, and a common law unfair competition claim against Coast. Compl. ¶¶16-28. The dispute between the parties concerns statements about the hardness and type of steel used in Coast's products.[2] Coast has admitted to advertising some of its products as being constructed of 440C steel and having a hardness of 57 to 59 on the Rockwell C scale, a measure of "hardness" that is abbreviated "HRC". Answer ¶¶6-9. 440C is a higher grade steel and presumably, more expensive than other types of steel.

Leatherman had 61 different types of Coast knives independently tested for the type of steel and hardness of the blade. Leatherman Memo, 5; Decl. of Alexis Puerta in Supp. of Mot. for Prelim. Inj. ("Puerta Decl."). The results show that none of the tested knives were made of 440C steel. Id. As for hardness, only two of the tested knives had a hardness of 57 to 59 HRC. Id. at 6. Coast's expert, John Biskey, does not dispute the testing procedures used by the laboratory hired by Leatherman. Decl. of John Biskey in Supp. of Def.'s Response ("Biskey Decl.") ¶5. Further, Biskey's analysis of test results from another laboratory confirms Leatherman's findings. Id. at ¶6. Besides these test results, in November 2010, Coast learned that its factory in China was using 420 stainless steel instead of the purported 440C steel. Def.'s Memo. in Opp. to Mot. for Prelim. Inj. ("Coast Response"), 4. In June 2011, after this lawsuit had been filed, Coast issued a press release to employees and sales representatives admitting that

---

[2]One such statement from Coast's 2011 product catalog: "COAST knives & tools use only the finest quality 440C specially treated cutlery steel from Seki, Japan. An excellent steel for performance and durability, 440C is a high-chromium stainless steel with a terrific balance between hardness and corrosion resistance. COAST steel is produced in small quantities exclusively for the production of knife blades." Decl. of Kaley Fendall in Supp. of Mot. for Prelim. Inj. ("Fendall Decl.") Ex. 1.

most of its products are made with 420J2 steel. Fendall Decl. Ex. 20.

Since Leatherman filed the complaint and motion for preliminary injunction, Coast has taken some corrective actions[3] and argues that an injunction is unnecessary. In its reply, Leatherman argues that the corrective actions are insufficient. Although Coast has not informed its retailers, it sent the following notice to its e-retailers on July 20, 2011.

> Dear COAST Retailer:
>
> Due to some recently discovered sourcing issues in connection with the production of some of our knives and multi-tools, we suggest you review your website descriptions of all COAST Knives and Multi-Tools and make the following change.
>
> Where you currently use the term 440C stainless steel to describe any of our knives or multi-tools, please change that description to read "400 series stainless steel". If you have any questions about this or need assistance in this effort please contact Rob Willhite at 800-426-5858.
>
> Thank you.
> COAST Products

Leatherman Memo, 13. Leatherman argues that this notice was ineffective, as only eight out of 41 e-retailers have made this change. Id. at 14. Coast feels that it has done enough to correct its false statements regarding the type of steel and hardness of its blades. Leatherman disagrees and requests a preliminary injunction.

## STANDARDS

A party seeking a preliminary injunction "must establish that he is likely to succeed on

---

[3]Coast asserts that they have removed all references to 440C steel in its catalogs, product packaging, and marketing materials and have printed new materials. Coast Response, 5. Instead of touting 440C steel, Coast proclaims that its products are "now made with 420 stainless cutlery steel". Supp. Decl. of David Brands in Opp. to Mot. for Prelim. Inj. ("Supp. Brand Decl.") Exs. A. Although it appears that Coast's products have previously been made out of 420 stainless steel, at least since Leatherman bought the 61 Coast knives for testing.

4 - OPINION & ORDER

the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." Winter v. Natural Resources Defense Council, Inc., 555 U.S. 7, 20 (2008). The plaintiff "must establish that irreparable harm is likely, not just possible." Alliance For The Wild Rockies v. Cottrell, 632 F.3d 1127, 1131 (9th Cir. 2011). The court may apply a sliding scale test, under which "the elements of the preliminary injunction test are balanced, so that a stronger showing of one element may offset a weaker showing of another." Id. Thus, a party seeking an injunction may show greater irreparable harm as the probability of success on the merits decreases. Id. (noting also that the relevant test in the Ninth Circuit is described as the "serious questions" test where the likelihood of success is such that "serious questions going to the merits were raised and the balance of hardships tips sharply in [plaintiff's] favor.").

DISCUSSION

I.  Likelihood of Success on the Merits

The elements of a § 43(a) Lanham Act claim are: (1) a false statement of fact by the defendant in a commercial advertisement about its own or another's product; (2) the statement actually deceived or has the tendency to deceive a substantial segment of its audience; (3) the deception is material, in that it is likely to influence the purchasing decision; (4) the defendant caused its false statement to enter interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the false statement, either by direct diversion of sales from itself to defendant or by a lessening of the goodwill associated with its products. Southland Sod Farms v. Stover Seed Co., 108 F.3d 1134, 1139 (9th Cir. 1997).

1.  Falsity in a Commercial Advertisement

5 - OPINION & ORDER

Through its corrective actions, Coast has indirectly admitted to falsely stating that its products are made from 440C steel, have a hardness of 57-59 HRC, and are individually tested for hardness.  Coast Response, 18.  These statements appeared on its website, catalog, product mini-catalogs, and product packaging.  Falsity is not an issue here.  To qualify as a commercial advertisement, the statement must be "(1) commercial speech; (2) by a defendant who is in commercial competition with plaintiff; (3) for the purpose of influencing consumers to buy defendant's goods or services"; and (4) the advertisement or promotion "must be disseminated sufficiently to the relevant purchasing public to constitute 'advertising' or 'promotion' within that industry."  Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co., 173 F.3d 725, 735 (9th Cir. 1999) (citing Gordon & Breach Science Publishers, Ltd. v. American Inst. of Physics, 859 F. Supp. 1521 (S.D.N.Y. 1994).  Leatherman has submitted evidence of Coast's website, catalog, product inserts, product packaging, and press releases that include the undisputedly false statements.  Fendall Decl. Exs. 1-5; Am. Decl. of John McGrory, Jr. in Supp. of Leatherman Reply ("McGrory Decl.") Exs. 1-3.  There is no doubt that Coast made these false statements about its products in a commercial advertisement.

    2.    Deception

The second element of a false advertising claim requires that the statement actually deceive or has a tendency to deceive a substantial portion of its audience.  Southland Sod Farms, 108 F.3d at 1139.  Statements that are literally false are presumed to have a tendency to deceive. Collegenet, Inc. v. Xap Corp., 442 F. Supp. 2d 1070, 1079 (D. Or. 2006) (citing Clorox Co. Puerto Rico v. Proctor & Gamble Commercial Co., 228 F.3d 24, 33 (1st Cir. 2000)).  See also McNeil-P.C.C., Inc. v. Bristol-Myers Squibb Co., 938 F.2d 1544, 1549 (2d Cir. 1991) (When

"the advertising claim is shown to be literally false, the court may enjoin the use of the claim without reference to the advertisement's impact on the buying public.") (internal quotations omitted). Because Coast statements were literally false, there is a presumption that the statements had a tendency to deceive.

Coast discusses this element in one footnote within its discussion of materiality. Coast Response, 16, n.4. Coast argues that it has rebutted the presumption that the statements had a tendency to deceive with the results of its consumer survey. Decl. of Michael Riley in Supp. of Coast Response ("Riley Decl.") Ex. B. The online survey tabulated 400 responses from consumers who had purchased a sport/outdoor knife or a multi-purpose tool in the past two years and was somewhat likely to purchase another one in the next 12 months. Riley Decl. Ex. B at 17. I do not find the survey helpful in determining whether the statements had a tendency to deceive because the survey participants were never presented with the false statements. Id. at 33-39. Coast has not presented evidence sufficient to rebut the presumption that the literally false statements had a tendency to deceive.

       3.      Materiality

Leatherman must show that the deception is material–that the false statements are likely to influence the purchasing decision. In other words, Coast's statements about using 440C steel or that its blades are individually tested to have a hardness of 57-59 HRC must have influenced the consumer to purchase Coast's products. Leatherman argues that courts may presume materiality "if the defendant made an intentionally false statement" with respect to its products. Leatherman Reply, 12; Healthport Corp. v. Tanita Corp. of Am., 563 F. Supp. 2d 1169, 1180 (D. Or. 2008) (citing Harper House, Inc. v. Thomas Nelson, Inc., 889 F.2d 197, 209 (9th Cir. 1989).

7 - OPINION & ORDER

At this point in the case, there is insufficient evidence to find that Coast intentionally made the false statements. Thus, Leatherman is not entitled to a presumption of materiality.

Leatherman provided the declaration of Ben Rivera, its Vice President of Business Development and Principal Design Engineer to support its contention that Coast's false statements were material. Although Mr. Rivera declares that he is familiar with consumer perceptions due to his involvement with the sales and marketing of Leatherman products, I do not find that his statements alone necessarily prove materiality. Decl. of Ben Rivera in Supp. of Mot. for Prelim. Inj. ("Rivera Decl.") ¶5. For example, Mr. Rivera states that the type of steel is one of the most important factors in a purchasing decision is his declaration. Rivera Decl. ¶17. However, there no explanation as to the basis for Mr. Rivera's opinion.

Leatherman has presented some evidence that I find supportive of materiality. A consumer had purchased a Coast knife and wrote the following review of the product: "I just bought this exact same knife from a department store. I was impressed that it was so cheap for a knife that has a blade made from 440C stainless steel." Decl. of Jennifer Davis in Supp. of Leatherman Reply ("Davis Decl.") Ex. 6. This comment shows that the consumer was swayed by the 440C steel description about Coast's product. Further, this is the type of reaction that David Brands, President of Coast, had hoped to achieve with the false statements about 440C steel and hardness. Leatherman Reply, 9. Brands included these statements because he thought they would be important to the consumer and would distinguish Coast's products from competitors. David Brands Dep. 38:20-41:9, August 10, 2011, attached as Ex. 4 to McGrory Decl.

There is also support for materiality in Coast's consumer survey. Riley Decl. Ex. B.

Respondents were asked the open-ended question of which features or consideration were most important when purchasing a knife or multi-tool. Id. at 18. The majority of respondents gave answers that related to the material or quality of the product.[4] Id. at 18-20. The type of steel and the hardness of the blades are directly related to the material and quality of a product. The survey also shows that 17% of respondents said that a particular type of steel "greatly influences" the purchasing decision. Id. at 10. Coast argues that the survey shows that the statements were not material because consumers could not recognize the 440C descriptor or the hardness scale. I am not persuaded. Simply because consumers were unable to recognize the 440C descriptor does not mean they would not be influenced by the perception of a superior product. Coast's false claim of 440C steel leads consumers to believe that they are purchasing a better product for a similar price. This common sense analysis was confirmed by 17% of the survey respondents who were greatly influenced by the type of steel used. I therefore conclude that Leatherman has established the element of materiality.

    4.  Interstate Commerce

  The false statements appeared on Coast's website, product packaging, catalogs, and on the product itself. Coast admits that it has a distribution network of over 10,000 retail outlets in the United States and a presence in approximately 30 foreign countries. Coast Response, 2. This admission is sufficient to show that the false statements entered interstate commerce.

    5.  Injury

  Both parties have merged discussion of injury as an element of a false advertising claim

---

[4]Sample response include durability, quality, strength, type of steel, material, hardness, etc. Riley Decl. Ex. B at 18-20.

with the discussion of irreparable harm, the second factor of the preliminary injunction analysis. I therefore turn to analyzing irreparable harm.

II.     Irreparable Harm

Leatherman argues that it is entitled to a presumption of irreparable harm if a tendency to deceive has been established. Leatherman Memo, 13. Coast counters that there is no presumption, particularly after eBay, Inc. v. MercExchange, LLC, a case in which the Supreme Court reviewed the grant of a permanent injunction after a finding of patent infringement. 547 U.S. 388 (2006). The eBay Court disapproved of the use of "categorical" rules with respect to irreparable harm. Id. at 393. The scope of eBay has been the subject of a multitude of court decisions, law reviews, and treatises. It is now clear that eBay signifies a return to traditional equitable principles, under which presumptions of harm are not allowed.

Oral argument for this motion was heard on August 22, 2011. That same day, the Ninth Circuit issued a per curiam opinion in Flexible Lifeline Sys. v. Precision Lift, Inc., Case No. 10-35987, 2011 U.S. App. LEXIS 17462 (9th Cir. Aug. 22, 2011). In Flexible Lifeline, the court engaged in an in-depth analysis about the effect of eBay on the remedy of injunctions. Id. at 16-19. The court swept away any doubt that eBay has broad implications–finding that it applies equally to preliminary and permanent injunctions, and is not limited to the context of patent infringement cases. Id. The court then reversed its long-standing precedent that irreparable harm may be presumed in copyright infringement cases once there was a showing of a likelihood of success on the merits. Id. at *14, 25.

While the holding in Flexible Lifeline applied to copyright infringement cases, there is no language in the court's rationale that would indicate a different standard for other types of cases.

10 - OPINION & ORDER

In its analysis, the court disregarded a prior opinion, Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co., 571 F.3d 873, 877 (9th Cir. 2009), a trademark infringement case in which the panel applied the presumption of irreparable harm without an analysis of the effect of eBay. Flexible Lifeline, 2011 U.S. App. LEXIS 17462, at *23 ("The panel's summary treatment of the presumption without consideration of the effect of eBay and Winter does not bind this panel or constitute an affirmation of the presumption's continued vitality."). It is clear that relying on presumptions of irreparable harm for injunctive relief is not appropriate after eBay.

   The Ninth Circuit is not alone in concluding that presumptions of irreparable harm are not allowed after eBay. The Second Circuit was presented with the same question that was raised before the Ninth Circuit in Flexible Lifeline. Salinger v. Colting, 607 F.3d 68 (2d Cir. 2010). In Salinger, the court ruled that the traditional principles of equity are the "presumptive standard for injunctions in *any context*", indicating that presumptions of irreparable harm are no longer appropriate. Id. at 77-78 (emphasis added). The First, Fourth, and Eleventh Circuits have also raised similar concerns over presumptions of irreparable harm. See CoxCom, Inc. v. Chaffee, 536 F.3d 101, 112 (1st Cir. 2008) (applying eBay to copyright infringement case); Christopher Phelps & Assocs., LLC v. Galloway, 492 F.3d 532, 543 (4th Cir. 2007) ("In eBay, the Supreme Court rejected any notion that 'an injunction automatically follows a determination that a copyright has been infringed.'"); N. Am. Med. Corp. v. Axiom Worldwide, Inc., 522 F.3d 1211, 1227 (11th Cir. 2008) (concludes plaintiff is not entitled to a presumption in non-comparative false advertising case without "address[ing] whether this conclusion is also indicated by eBay[.]"). Leatherman recognizes in its memorandum that the Ninth Circuit had not spoken on this topic. I am left to predict how the Ninth Circuit will address the issue of presumptions of

11 - OPINION & ORDER

irreparable harm for claims under the Lanham Act. Leatherman Memo, 13. Given the direction that the Supreme Court and Ninth Circuit have taken in the context of copyright and patent cases, I decline to find that a presumption of irreparable harm exists in a false advertising claim.

Without a presumption, Leatherman must present evidence of a likelihood of irreparable harm from Coast's false statements. Leatherman once again offered the declaration of Mr. Rivera, one of its senior executives to vouch for Leatherman's harm from the false statements. Mr. Rivera declared that consumers "will be diverted to Coast's falsely advertised 440C knives" and that this diversion "erodes Leatherman's overall market share." Rivera Decl. ¶¶23-24. These declarations alone are insufficient to support a finding that Leatherman has indeed lost consumers or market share. Mut. Pharm. Co. v. Ivax Pharms., Inc., 459 F. Supp. 2d 925, 945 (C.D. Cal. 2006) ("speculative beliefs are insufficient to establish irreparable harm") (citing Telebrands Corp. v. The Media Group. Inc., 45 U.S.P.Q.2d 1342, 1345 (S.D.N.Y. 1997) ("plaintiff must offer something more than a mere subjective belief that it is likely to be injured as a result of the false advertising")). Even if the false statements had a tendency to deceive, it is unclear whether the consumer was diverted from Leatherman or another manufacturer of knives and multi-tools.[5] The false statement may have deceived the consumer, but Leatherman did not necessarily suffer the harm of a lost sale if the consumer was a considering a non-Leatherman product. While I recognize that it is difficult to demonstrate a diverted sale, it is not impossible. In short, the current record is inadequate on the issue of irreparable harm. Without any basis for its allegations of diverted sales and lost market share, I cannot conclude that Leatherman suffered

---

[5]A simple search on the Internet for "multi-tool" reveals other brands such as Victorinox, Gerber, SOG, and Schrade.

12 - OPINION & ORDER

irreparable harm from Coast's false statements.

III.   Balancing the Equities & Public Interest

Leatherman argues that there is no equitable interest in allowing false statements in advertising. Leatherman Memo, 16. Coast counters by arguing that it will suffer "reputational and monetary harm" if required to a second corrective notice. First, the corrective notice sent in July 2011 to 41 e-retailers was ineffective, as only eight of the e-retailers corrected the false description of Coast's products. More importantly, the notice was not sent to any of Coast's 10,000 retail outlets in the United States. Second, I find it ironic that Coast is concerned about the effect that a second corrective notice might have on its reputation. It seems Coast was not concerned about its reputation when it blindly made assertions as to the quality of its products. Coast relied on the word of its Chinese trading company, despite having had product quality issues in the past. Brands Dep. 59:16-60:4; 66:8-67:7; 115:5-117:22. Even assuming that the false statements were unintentional[6], Coast knew about the false statements in November 2010, but took no significant corrective action until after Leatherman filed its complaint.[7] Coast Response, 4-5. Coast also argues that it has done enough to rectify the problem, even though e-retailers are still using these false statements about Coast's products. Fendall Decl. Exs. 6-17. Coast seems content to continue to reap the benefits of these false statements. The balance of the

---

[6]Coast blames a supplier to its factory in China for the lower grade steel and the lower hardness of its products. Coast Response, 4.

[7]Although Coast claims that it began removing the false statements from its catalogs, product packaging, and marketing materials in December 2010, the false statements still permeated Coast's website and catalog. For example, the 2011 catalog contains the false statements and no effort has been made to recall the catalogs. McGrory Decl. Ex. 1; Brands Dep. 36:15-22. Coast's website was not changed until after Leatherman filed this lawsuit. Leatherman Reply, 3.

13 - OPINION & ORDER

equities favors Leatherman, not Coast. Last, I agree with Leatherman that it is in the public's interest to prevent false or misleading statements from permeating the marketplace.

## CONCLUSION

In my analysis of whether a preliminary injunction should issue, three of the four factors–likelihood of success on the merits, balance of the equities, and the public interest–favor Leatherman. I cannot however, grant Leatherman's request for a preliminary injunction because it has failed to show a likelihood of irreparable harm. The motion for preliminary injunction [#9] is denied.

IT IS SO ORDERED.

Dated this 11th day of October, 2011.

/s/ Marco A. Hernandez
Marco A. Hernandez
United States District Judge